Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| COOPERATIVA DE AHORRO Y CRÉDITO ROOSEVELT ROADS<br><br>Apelados<br><br>v.<br><br>ANTONIO TORRES MONTES Y OTROS<br><br>Apelantes | KLAN202400963 | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de Carolina<br><br>Civil Núm.: F CD2013-1829 (403)<br><br>Sobre: Cobro de Dinero |
|---|---|---|

Panel integrado por su presidente, el Juez Hernández Sánchez, la Jueza Santiago Calderón y la Jueza Álvarez Esnard.

Álvarez Esnard, jueza ponente

## SENTENCIA

En San Juan, Puerto Rico, a 9 de enero de 2025

Comparece ante nos el señor Antonio Torres Montes ("señor Torres Monte"), su esposa la señora Sonia Pabón González ("señora Pabón González") y la Sociedad Legal de Gananciales compuesta por ambos (en conjunto, "los Apelantes") mediante *Apelación* presentada el 25 de octubre de 2024. Nos solicita que revoquemos la *Sentencia* emitida el 20 de septiembre de 2024 y notificada el 25 de septiembre de 2024 por el Tribunal de Primera Instancia, Sala Superior de Carolina ("foro primario" o "foro *a quo*"). Por virtud de la misma, el foro primario declaró *Ha Lugar* la *Demanda* sobre cobro de dinero incoada por la Cooperativa de Ahorro y Crédito Roosevelt Roads ("Cooperativa" o "Apelada"). En consecuencia, el foro primario determinó que los Apelantes eran responsables de pagar tres millones trecientos noventa y cuatro mil cuatrocientos ocho dólares con cincuenta y nueve centavos ($3,394,408.59), a los cuales había que descontarle la cantidad de quinientos dieciséis mil ochocientos veinte dólares ($516,820.00) por concepto de cinco (5) certificados

de ahorros, más los intereses que estos generaron. Asimismo, el foro *a quo* declaró *No Ha Lugar,* la reclamación de cobro de los cinco certificados de ahorro y una reclamación en daños que estos hicieron contra la Apelada.

Por los fundamentos expuestos a continuación, **confirmamos** la *Sentencia* apelada.

**I.**

Conforme surge del expediente ante nuestra consideración, el 2 de diciembre de 2013, la Cooperativa instó *Demanda* sobre cobro de dinero y enriquecimiento injusto contra los Apelantes. En síntesis, alegó que el señor Torres Montes, quien era socio de la Cooperativa realizó varias transacciones con dicha institución. Arguyó que, posteriormente, se inició una auditoría forense en la que se le proveyó la documentación al señor Torres Montes y su representante legal. No obstante, sostuvo que la auditoría demostró que el señor Torres Montes tomó o recibió fondos que no le pertenecían por la cantidad de un millón setecientos sesenta mil sesenta y un dólares con ochenta y tres centavos ($1,760,061.83). Señaló que los Apelantes eran responsables de los ingresos que la Cooperativa dejó de devengar por los fondos que disfrutaron y no le pertenecían. Por tal motivo, solicitó que éstos pagaran una suma de dos millones sesenta y siete mil ciento cuarenta y cuatro dólares con sesenta y tres centavos ($2,067,144.63) y que se le condenara al pago de honorarios de abogado por temeridad.

Transcurridos múltiples trámites procesales, el 2 de septiembre de 2022, el foro primario emitió *Resolución* mediante la cual declaró *No Ha Lugar* la solicitud de sentencia sumaria presentada por la Cooperativa.[1] De dicho dictamen y en cumplimiento con la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap.

---

[1] Véase, apéndice del recurso, págs. 62-84.

V R 36.4, el foro *a quo* formuló las siguientes determinaciones de hechos no controvertidos:

1. Antonio Torres Montes se dedica a operar negocios de hospedería, petróleo, gasolinera, delicatessen con juegos de azar, inversiones y rentas.

2. Antonio Torres Montes se desempeña como comerciante desde el 7 de noviembre de 1979 hasta el presente.

3. En el año 1999, Antonio Torres solicitó ser socio de la Cooperativa y fue admitido ese mismo año, asignándosele el número de socio 30715. En vista de ello, lleva 20 años como socio de la Cooperativa.

4. Antonio Torres también mantiene cuentas hace muchos años en otras instituciones depositarias y casas de corretaje tales como Banco Popular, Oriental, Scotiabank, Santander, Firstbank, Pentágono, Dean Witter, Merrill Lynch, y Citicorp.

5. En el año 2012, la Cooperativa descubrió que en la Sucursal de Ceiba habían acontecido eventos de transacciones irregulares. Ello llevó a que la Cooperativa comenzara una investigación, a través del CPA William Torres Cruz, respecto de ciertas transacciones irregulares en varias cuentas de varios socios, incluyendo la de Antonio Torres.

7. Entre los actos irregulares que llevó a cabo, que incluyeron depósitos, retiros y transacciones no autorizadas por socios, la señora Figueroa Román firmó certificados de depósito (CD) sin autorización de la Cooperativa y excediendo su autoridad respecto de la tasa de interés, ya que se excedió de los límites preestablecidos por la Cooperativa sin que la institución tuviera conocimiento alguno o lo hubiera aprobado.

8. El proceso de identificación de retiros y depósitos legítimos con Antonio Torres consistió de entrevistas donde se le mostró evidencia de cada una de las transacciones, tanto depósitos como retiros, para que Antonio Torres identificara cuáles él mismo reconocía como válidas y cuáles no. A base de toda esa información y entrevistas se preparó la declaración jurada.

9. Antonio Torres tuvo oportunidad de leer la declaración jurada antes de firmarla ante Notario.

10. El representante legal de Antonio Torres tuvo acceso a la declaración jurada previo a su firma y revisó la misma en más de una ocasión.

11. Según refleja la declaración jurada suscrita por Antonio Torres, este admitió bajo juramento que los depósitos que en efecto realizó son los siguientes:

| Fecha | Cantidad | Concepto |
|---|---|---|
| 3-3-2004 | $230,000.00 | Depósito mediante cancelación de certificado de ahorro núm. 12632 autorizado y realizado por mí |
| 2-12-2005 | $108,000.00 | Depósito mediante cancelación de certificado de ahorro núm. 13142 autorizado y realizado por mí |

| Fecha | | Concepto |
|-------|---|----------|
| 2-13-2008 | $32,000.00 | Depósito autorizado y realizado por mí |
| 7-2-2008 | $200,000.00 | Depósito autorizado y realizado por mí |
| 11-19-2008 | $171,415.92 | Depósito - Cancelación de certificado de ahorro núm. 364 autorizada y realizada por mí y apertura del certificado de ahorro un núm. $92,621.94 |
| 11-20-2008 | $240,793.98 | Depósito autorizado y realizado por mí |
| 5-7-2009 | $37,000.00 | Depósito - Cancelación del certificado de ahorro núm. 401 autorizando y realizado por mi |
| 9-30-2009 | $50,000.00 | Depósito autorizado y realizado por mí |

**Los depósitos validados bajo juramento realizado por Antonio Torres ascienden a $1,019,209.90.**

12. Según refleja la declaración jurada suscrita por Antonio Torres, este declaró bajo juramento que los retiros que en efecto realizó son las siguientes:

| Fecha | Cantidad | Concepto |
|-------|----------|----------|
| 3-17-2011 | $190,008.00 | Retiro - Compra del cheque de gerente núm. 164735 a nombre de Ernesto Corchado Serrano ($190,000.00) |
| 10-3-2011 | $43,371.32 | Retiro - Compra del cheque de Gerente núm. 165547 a nombre de First Mortgage ($43,263.32) |
| 10-31-2011 | $138,179.00 | Retiro autorizado y realizado por Torres Montes para la compra de los cheques de gerente núm. 165565, 165566, 165567, 165568 y 165569 |

| Fecha | Cantidad | Concepto |
|-------|----------|----------|
| 12-26-2003 | $3,402.74 | Retiro no identificado mediante el cheque operacional núm. 050224. Entiendo que esta cantidad corresponde a los intereses pagados sobre certificado de ahorros |
| 12-26-2003 | $740.00 | Retiro no identificado mediante el cheque operacional núm. 050221. Entiendo que esta cantidad corresponde a los intereses pagados sobre certificado de ahorros |
| 12-26-2003 | $1,450.00 | Retiro no identificado mediante el cheque operacional núm. 050222. Entiendo que esta cantidad corresponde a los intereses pagados sobre certificado de ahorros |

| | | |
|---|---|---|
| 12-26-2003 | $370.00 | Retiro no identificado mediante el cheque operacional núm. 050223. Entiendo que esta cantidad corresponde a los intereses pagados sobre certificado de ahorros |
| 3-3-2004 | $108,000.00 | Retiro autorizado y realizado por para la apertura del certificado de ahorro núm. 13142 |
| 4-6-2004 | $141,000.00 | Retiro - compra del cheque de gerente núm. 048628 a nombre de Martin G. Uscamayta Sánchez ($141. 00) |
| 8-3-2004 | $4,027.16 | Retiro autorizado por mímí mediante el cheque operacional núm. 000995 |
| 2-14-2005 | $10,903.89 | Retiro autorizado y realizado por mímí mediante el cheque operacional núm. 001987 |
| 5-23-2005 | $85,000.00 | Retiro - Compra de cheque de gerente núm. 057374 a nombre de Cayey Auto Distributors ($100,000) |
| 8-12-2005 | $25,853.78 | Retiro compra de cheques de gerente núm. 057450 a nombre de Auto Servicio Muñoz Rivera ($22,500) y 057451 a nombre de Antonio Torres Montes ($3,339.78) |
| 10-17-2005 | $359,829.60 | Retiro - compra de cheque de gerente núm. 72792 a nombre de AntonioTorres Montes ($359,829.60) |
| 11-18-2005 | $38,000.00 | Retiro - compra de cheque de gerente núm. 72832 a nombre de Auto Parts, Inc. ($38,000) |
| 4-3-2006 | $13,000.00 | Retiro - compra de cheque de gerente núm. 81762 a nombre de RG Mortgage Corp. ($13,000) |
| 5-9-2006 | $15,646.00 | Retiro autorizado por mímí mediante el cheque operacional núm. 003406 |
| 6-26-2006 | $526,675.00 | Retiro - compra de cheque de gerente núm. 81874 a nombre de Esso Standard Oil Comp. Inc. ($526,675). Para realizar esta transferencia, le solicité a la Sra. Figueroa que me cancelara varios certificados de ahorro |
| 7-28-2006 | $18,500.00 | Retiro - compra de cheque de gerente núm. 81916 a nombre de Cooperativa de Seguros Múltiples, Corp. ($18,500) |
| 8-10-2006 | $550,000.00 $90.00 $90.00 | Retiro - compra de cheque de gerente núm. 81930 a nombre de Esso Standard Oil Company de PR, ($550,000), 81931 a nombre de Secretario de Hacienda ($90.00) y 81932 a nombre de Secretario de Hacienda ($90.00) |

| | | |
|---|---|---|
| 10-9-2006 | $127,507.00 | Retiro - compra de cheque de gerente núm. 105758 a nombre de Carmen D. Pérez Muñoz |
| 10-23-2006 | $200,000.00 | Retiro - compra de cheque de gerente núm. 105770 a nombre de Chevron PR LL |
| 5-3-2007 | $16,900.00 | Retiro - compra de cheque de gerente núm. 108454 a nombre de Universal Insurance |
| 12-4-2007 | $502,500.00 | Retiro - compra de cheque de gerente num. 116205 a nombre del Lcdo. Wilfredo Segarra miranda (Sindico Cap. 7) |
| 8-2-2008 | $30,000.00 | Retiro - compra de cheque de gerente núm. 134394 a nombre de Nereida Robles ($6,600) y 134395 a nombre de Minerva Cáceres Acosta ($37,436.42). Para comprar dichos cheques traje efectivo por $30,000 y el cheque núm. 107 del banco Santander (cuenta núm. 3106407133) por la cantidad de $14,036.42. En esta transacción me atendió personalmente, como de costumbre, la Sra. Rosa Figueroa. Reconozco que firmé por equivocación una hoja de retiro de $30,000, que aparece en los archivos de la Cooperativa. Este retiro no se utilizó para la transacción, ya que esta se realizó con el dinero en efectivo que traje a la Cooperativa; y que le entregué personalmente la Sra. Rosa Figueroa |
| 12-4-2008 | $240,807.00 | Retiro - compra de cheque de gerente núm. 139763 ($176,623.98) y 139764 ($64,169.02), ambos a nombre de Antonio Torres Montes |
| 3-19-2009 | $49,768.00 | Retiro - compra de cheque de gerente núm. 149339 a nombre de Puerto Rico Supplies ($49,760). Los fondos para realizar esta transacción provinieron de mís certificados de ahorro en la Cooperativa |
| 9-30-2009 | $150,000.00 | Retiro - compra de cheque de gerente núm. 148755 a nombre de Caribbean Petroleum Corp. Los fondos para realizar esta transacción provinieron de mís certificados de ahorro en la Cooperativa |

12.[sic] Los retiros validos bajo juramento por AT exceden los depósitos validados bajo juramento por Antonio Torres por $3,394,408.56.[2]

Así las cosas, el caso prosiguió con el trámite ordinario hasta los días 11 y 12 de diciembre de 2023, cuando se celebró el juicio en su fondo. Posteriormente, el 20 de septiembre de 2024, el foro primario emitió *Sentencia*,[3] la cual notificó el 25 de septiembre del mismo año. Por virtud de este dictamen, el foro primario incorporó las determinaciones de hechos que ya había formulado en la *Resolución* emitida el 2 de septiembre de 2022 y, además, enumeró las siguientes determinaciones de hechos:

1. El Sr. Carlos Maldonado lleva treinta y nueve (39) años laborando para la Cooperativa de Ahorro y Crédito Roosevelt Road. Desde el año 2000, se desempeña como presidente ejecutivo de la Cooperativa de Ahorro y Crédito Roosevelt Road.

2. Durante el tiempo que el Sr. Carlos Maldonado ha laborado para el demandante, y previo a fungir como presidente ejecutivo, este laboró como cajero, en contabilidad y asistente del presidente ejecutivo.

3. Dentro de las funciones que realiza el Sr. Carlos Maldonado como presidente ejecutivo, se encuentran preparar plan estratégico de la cooperativa, plan de capacitación, representar al demandante, buscar nuevos negocios, despedir empleados y supervisar a los gerentes de las siete (7) sucursales.

4. El Sr. Carlos Maldonado supervisaba a los gerentes de las sucursales a base de reportes y visitar al lugar de trabajo, Entre los reportes que examinaba, se encontraban lo relacionados con los ingresos, gastos, auditorias, metas establecidas para la otorgación de préstamos y estados financieros.

5. Con respecto al señor Rosa Figueroa Román, y a base del testimonio del Sr. Carlos Maldonado, la prueba creída y apreciada estableció que Figueroa Román laboraba para el demandante, en la sucursal de Ceiba y eventualmente fue despedida de su empleo.

6. La prueba creída y apreciada estableció que Rosa Figueroa Román fue despedida a raíz de una auditoria encomendada y realizada por el demandante, que reflejaba transacciones irregulares que no estaban acorde con las políticas de la empresa.

7. El Sr. Carlos Maldonado no participó directamente de dicha auditoria.

8. Según el exhibit conjunto número uno romano (I), estipulado por las partes, a la señora Rosa Figueroa Román se le despidió de su empleo mediante la carta fechada del 3 de enero del 2013. La misma expresa, que hubo una auditoria de ciertas transacciones irregulares en cuentas de acciones y cuentas de depósitos de varios

---

[2] *Íd.*, págs. 66-70.
[3] *Íd.*, págs. 3-29.

socios de la sucursal de Ceiba, que ha demostrado que usted incurrió en varias violaciones a los procedimientos establecidos en nuestra institución para la apertura y manejo de dichas cuentas. El resultado de entrevistas a socios, exámenes de documentos relativos a dichas cuentas y manifestaciones escritas y verbales suyas, revelaron, entre otras cosas, que usted (Torres- Montes) aperturó [sic] cuentas de depósito con tasas de intereses distintas a las aprobadas por la alta gerencia de la Cooperativa, desembolsó de forma irregular el pago de intereses en distintas cuentas de depósito, usted tramitó retiros y transacciones en las cuentas de estos socios donde la firma que aparece en las hojas de retiro no parece concordar con las firmas autorizadas de la cuenta, aceptó depósitos en efectivo sin cumplir con procedimientos y disposiciones estatutarias y reglamentarias federales aplicables a los mismo, emitió cheques para terceros en violación a las normas de la cooperativa, efectuó y/o autorizó retiros de cuentas de acciones de manera contraria a las normas y procedimientos de la Cooperativa, violó procedimientos internos de la institución al accesar [sic] de forma electrónica y sin autorización cuentas de socios y clientes.

9. El Sr. Carlos Maldonado declaró que una de las razones por la cual el demandante no paga los certificados de depósito al demandado Antonio Torres Montes, es que este no tiene fondos disponibles en la Cooperativa de Ahorro y Crédito.

10. Durante el turno de prueba de la parte demandada, el Sr. Carlos Maldonado fue sentado a declarar por dicha parte. La prueba creída y apreciada estableció que para la fecha en que se expidieron los certificados de ahorro a favor del demandado Antonio Torres Montes, la Cooperativa de Ahorro y Crédito Roosevelt Roads pagaba los intereses al 8%. Los intereses que surgen de dichos certificados de ahorro no eran los autorizados por el demandante.

11. Por otro lado, las partes estipularon que dado la indisponibilidad de la señora Rosa Figueroa Román para comparecer a juicio, su testimonio fue sustituido por una deposición que le fue tomada el 14 de agosto del 2018 y 6 de noviembre del 2018.

12. Surge de la deposición antes mencionada y de la apreciación del testimonio brindado por la señora Rosa Figueroa Román, que previo a su despido, laboró por cuarenta (40) años para el demandante Cooperativa de Ahorro y Crédito Roosevelt Roads.

13. De los cuarenta (40) años que la señora Rosa Figueroa Román trabajó para la Cooperativa de Ahorro y Crédito Roosevelt Roads, treinta y cinco (35) fueron como gerente en la sucursal ubicada en el Municipio de Ceiba.

14. La señora Figueroa Román conocía al demandado Antonio Torres Montes porque era cliente de la Cooperativa de Ahorro y Crédito Roosevelt Roads y ambos residían en la urbanización Río Grande Country Club. Pero su relación con Torres Monte era estrictamente profesional.

15. Según la señora Figueroa Román, el proceso para abrir un certificado de ahorro en la Cooperativa de Ahorro y Crédito Roosevelt Roads, era necesario que la persona interesada en abrir el mismo, se personara a la sucursal con dinero en efectivo o cheque personal o de gerente, el funcionario le solicitaba una identificación a la persona,

se colocaba la información en el formulario que estaba en la computadora y luego se imprimía el certificado

16. La información que se colocaba en el formulario era el número de cuenta del cliente, la cantidad del dinero que se depositó y el pago mensual de los intereses a pagar. La señora Figueroa Román declaró que la Cooperativa Ahorro y Crédito Roosevelt Roads, se quedaba con tres copias de dicho certificado.

17. Una vez se imprime el certificado de ahorro, el mismo refleja la fecha de emisión del documento, la fecha de vencimiento del certificado, el interés que devenga el certificado y el número de este.

18. Sobre la cancelación de un certificado de ahorro previamente expedido, la prueba apreciada estableció que cuando un cliente va a cancelar dicho certificado tiene que presentar el original en la sucursal y luego endosarlo con su firma. Según la declaración de la señora Figueroa Román, la Cooperativa de Ahorro y Crédito Roosevelt Roads retenía el certificado original y la depositaba en una caja, que ubicaba detrás de un mostrador. Otra forma de disponer del certificado cancelado era colocando el mismo en el expediente del cliente.

19. En el caso que el cliente va a cancelar dicho certificado de ahorro y no tiene el original porque se le extravió el mismo, el cliente tiene que presentar una declaración jurada en la sucursal. Dicha declaración se archiva de la misma forma que el certificado de ahorro original cancelado.

20. La señora Figueroa Román declaró que, en muchísimas ocasiones, canceló certificados de ahorros y no se quedó con el certificado original. Sobre esta situación, Figueroa Román declaró que como confiaba en el cliente, tampoco le solicitó una declaración jurada cuando ocurría dicha situación.

21. Durante la deposición de la señora Figueroa Román, esta autenticó como original el siguiente certificado de ahorro, el cual fue emitido por ella en su capacidad de gerente de la Cooperativa de Ahorro y Crédito Roosevelt Roads a favor del demandado Antonio Torres Montes: 1) Certificado de ahorro número 996, emitido el 8 de octubre del 2012, por la suma de $130,766.00, que se pagará al 1.60%. Dicho certificado tiene una nota a mano escrito que dice, se pagará al 8%. Esta nota no fue autenticada por la señora Figueroa Román. En cuanto al certificado, Figueroa Román no recuerda haber cancelado dicho certificado después del octubre del 2012.

22. Durante la deposición de la señora Figueroa Román, esta autenticó como original el siguiente certificado de ahorro, el cual fue emitido por ella en su capacidad de gente de la Cooperativa de Ahorro y Crédito Roosevelt Roads a favor del demandado Antonio Torres Montes; 2) Certificado de ahorro número 958, emitido en julio del 2012, por la suma de $114,00.00, que se pagará al 1.60%. Dicho certificado tiene una nota a mano escrito que dice, se pagará al 8%. La testigo Figueroa Román admite que escribió la nota, sin embargo, invocado su derecho constitucional a la no autoincriminación, se negó a contestar si ella tenía a autorización de la Cooperativa para incluir la misma.

23. Durante la deposición de la señora Figueroa Román, esta autenticó como original el siguiente certificado de ahorro, el cual fue emitido por ella en su capacidad de gerente de la Cooperativa de Ahorro y Crédito Roosevelt Roads a

favor del demandado Antonio Torres Montes; 3) Certificado de ahorro número 918, emitido en abril del 2012, por la suma de $33,580.00, que se pagará al 1.60%. Dicho certificado tiene una nota a mano escrito que dice, se pagará al 8%. La testigo Figueroa, Román admite que escribió la nota, sin embargo, invocado su derecho constitucional a la no autoincriminación, se negó a contestar si ella tenía autorización de la Cooperativa para incluir le misma.

24. Durante la deposición de la señora Figueroa Román, esta autenticó como original el siguiente certificado de ahorro, el cual fue emitido por ella en su capacidad de gente de la Cooperativa de Ahorro y Crédito Roosevelt Roads a favor del demandado Antonio Torrea Montes; 4) Certificado de ahorro número 946. emitido en julio del 2012, por la suma de $84,074.00, que se pagará al 1.60%. Dicho certificado tiene una nota a mano escrito que dice, se pagará al 8%. La testigo Figueroa Román admite que escribió la nota, sin embargo, invocado su derecho constitucional a la no autoincriminación, se negó a contestar si ella tenía autorización de la Cooperativa para incluir la misma.

25. Durante la deposición de la señora Figueroa Román, esta autenticó el siguiente certificado de ahorro como original, el cual fue emitido por ella en su capacidad de gerente de la Cooperativa de Ahorro y Crédito Roosevelt Roads a favor del demandado Antonio Torres Montes; 5) Certificado de ahorro número 650. emitido en septiembre del 2010, por la suma de $104,400.00, que se pagará al 1.60%. Dicho certificado tiene una nota a mano escrito que dice, se pagará al 8%. La testigo Figueroa Román admite que escribió la nota, sin embargo, invocado su derecho constitucional a la no autoincriminación, se negó a contestar si ella tenía autorización de la Cooperativa para incluir la misma

26. La señora Figueroa Román declaró en su deposición que se expidieron los certificados de ahorros antes mencionados, porque se supone que la parte demandante recibió el valor de los mismo.

27. Surge del testimonio de la señora Figueroa Román que el 26 de abril del 2002, el demandado Antonio Torres Montes le compró a la Cooperativa de Ahorro y Crédito Roosevelt Roads un certificado de ahorro por la suma de $400,000.00, entre otros.

28. Surge de la deposición tomada a la señora Figueroa Román que, como parte de la relación de negocio, ella visitaba con mucha frecuencia los negocios de Torres Montes, Figueroa Román reconoció que, en dichas visitas, recogía dinero en efectivo de Torres Montes para apertura los certificados de depósito.

29. Surge de la deposición tomada a la señora Figueroa Román, que esta negó haber recibido alguna solicitud que involucrarse al demandado Torres Montes en algún tipo de esquema fraudulento.

30. Surge de la deposición tomada a la señora Figueroa Román, que esta negó haber participado junto al demandado Torres Montes en algún tipo de esquema turbio relacionado con las actividades de la Cooperativa de Ahorro y Crédito Roosevelt Roads.

31. Surge de la deposición tomada a la señora Figueroa Román, que durante el tiempo que trabajó para la Cooperativa de Ahorro y Crédito Roosevelt Roads, Cossec

realizó auditorías con regularidad y no le notificaron señalamientos de manejos indebidos en la cooperativa.

32. En relación con los cincos (5) certificado de ahorro originales que el demandado solicita su pago, surge de la deposición tomada a la señora Figueroa Román y de la apreciación de este Tribunal, que de haber sido cancelados dichos certificados por la parte demandante, debería haber un documento firmado las partes, acreditando dicha cancelación. Durante el juicio, no se acreditó dicha cancelación.

33. La señora Carmen Quiñones López tiene un bachillerato en contabilidad y comenzó trabajando para la Cooperativa de Ahorro y Crédito Roosevelt Roads en el año 1990. Desde octubre del 2012, ocupa el puesto de cumplimiento. Entre sus funciones se encuentran velar que se cumpla con los controles internos de la Cooperativa y les regulaciones federales y estatales que rigen las transacciones bancarias, para evitar el lavado de dinero y en la lucha contra el terrorismo y las drogas. La señora Carmen Quiñones López también debía velar que se cumpla con las políticas de apertura de los certificados de depósitos.

34. Durante el testimonio de la señora Carmen Quiñones López, esta no realizó contra el demandado Torres Montes, ningún señalamiento que esto haya cometido alguna irregularidad en la apertura y eventual posesión de los certificados objetos de este pleito.

35. El demandado Antonio Torres Montes es mayor de edad y casado con Sonia Pabón González. Torres Montes tiene un diploma de cuarto año de escuela superior.

36. El co-demandado Antonio Torres Montes es un comerciante con muchos años de experiencia, que ha tenido la oportunidad de operar negocios de hospedería, petróleo, gasolinera y hacer inversiones.

37. Al momento de los hechos que motiva la demanda, Torres Montes era socio de la Cooperativa de Ahorro y Crédito Roosevelt Roads y mantenía en dicha institución, cuentas de acciones y certificados de depósitos. Como cliente de la Cooperativa, Torres Montes acudía a hacer sus transacciones a la sucursal de que ubica en el Municipio de Ceiba, Puerto Rico, donde era atendido por la Gerente de dicha Sucursal, Rosa A. Figueroa Román.

38. Desde el año dos mil diez (2010) al dos mil doce (2012), adquirió y tiene en su poder cinco (5) certificado de ahorros. Estos son: certificado de ahorro número 940, emitido de julio del 2012, por la suma de $84,074.00, certificado de ahorro número 650, emitido en septiembre del 2010, por la suma de $104,400.00, certificado de ahorro número 918, emitido en abril del 2012, por la suma de $83,380.00, certificado de ahorro número 945, emitido en julio del 2012, por la suma de $84,074.00, certificado de ahorro número 958, emitido en julio del 2012, por la suma de $114,00.00, y certificado de ahorro número 996, emitido el 8 de octubre del 2012, por la suma de $130,766.00. Los certificados originales establecen que se pagará al 1.60%.

39. La prueba creída y apreciada por el Tribunal estableció que la señora Rosa Figueroa Román se personaba a la estación de gasolina propiedad del demandado Torres Montes, ubicada en la entrada de El Verde y recibía de Torres Montes dinero en efectivo para la compra de certificados de ahorros. Rosa Figueroa Román le

entregaba los certificados sin recibo y el demandante tampoco los requería

40. La prueba creída y apreciada por el Tribunal estableció que, en diciembre del 2012, se presentó a la Cooperativa de Ahorro y Crédito Roosevelt Roads con el propósito de redimir y cobrar los cincos (5) depósitos de ahorros antes mencionados. Dichos certificados no fueron pagados, a consecuencia de la investigación (auditoría) que se estaba realizando a varios socios de la Cooperativa, incluyendo al demandado.

41. Durante del desfile de la prueba, no se presentó prueba clara y robusta, que el demandado Antonio Torres Montes haya participado en un esquema fraudulento de retiros de fondos en la Cooperativa de Ahorro y Crédito Roosevelt Roads. Todo apunta que dicha situación fue atribuible única y exclusivamente a la conducta de la Gerente de la Sucursal de Ceiba, Rosa Figueroa Román. Hay que reiterar, que, a base de la prueba apreciada, Figueroa Román se personaba a la estación de gasolina propiedad del demandado Torres Montes, ubicada en la entrada de El Verde y recibía de Torres Montes dinero en efectivo para la compra de certificados de ahorros. Rosa Figueroa Román le entregaba los certificados sin recibo y el demandado tampoco los requería.

42. Según el demandado Torres Montes, la presentación de la demanda que nos ocupa y el no poder cobrar los cinco (5) certificados de ahorros, causaron al demandado Torres Montes una situación de insomnio.

43. La co-demandada Sonia Pabón González es mayor de edad y esposa del demandado Torres Montes. La prueba creída y apreciada por el Tribunal, tenía poco conocimiento de las transacciones comerciales realizadas entre la demandante Cooperativa de Ahorro y Crédito Roosevelt Roads, y su esposo Torres Montes. La señora Pabón González se limitó a señalar que el presente caso le afectó su paz mental.[4]

Conforme a estas determinaciones de hechos, el foro *a quo* concluyó que la Apelada adeudaban la suma tres millones trecientos noventa y cuatro mil cuatrocientos ocho dólares con cincuenta y nueve centavos ($3,394,408.59) a los cuales habría de descontarle quinientos dieciséis ochocientos veinte dólares ($516,820.00) por concepto de cinco (5) certificados de ahorro adquiridos por el señor Torres Montes más los intereses que estos generen. Asimismo, en la *Sentencia* se declaró *No Ha Lugar* la reclamación interpuesta por el señor Torres Montes para recobrar dichas certificaciones y declaró *No Ha Lugar* la reclamación de los Apelantes en daños y perjuicio en su reconvención.[5]

---

[4] *Íd.*, págs. 12-20.
[5] De la misma forma, el foro primario aclaró en la *Sentencia* que el 30 de marzo de 2022, los Apelantes solicitaron el desistimiento voluntario sin perjuicio de una

Inconformes, el 25 de octubre de 2024, los Apelantes comparecieron ante esta Curia mediante el recurso de epígrafe y esbozaron los siguientes señalamientos de error:

> Erró el Tribunal de Primera Instancia al determinar la procedencia de la reclamación en cobro de dinero presentada por la cooperativa debido a que no se presentó evidencia suficiente para sostener su reclamación

> Erró el Tribunal de Primera Instancia al no conceder, junto con el pago de los certificados de depósitos, daños por incumplimiento a los aquí apelantes

El 25 de octubre de 2024, emitimos *Resolución* en la que le concedimos un término de treinta (30) días a la parte Apelada para que expusiera su posición en torno al recurso. Oportunamente, el 5 de diciembre de 2024, la Cooperativa presentó *Alegato en Oposición.* Con el beneficio de la comparecencia de todas las partes, procedemos a exponer la normativa jurídica aplicable al caso de autos.

## II.

### A. *Estándar de Revisión de Apreciación de Prueba*

La Regla 43.2 de Procedimiento Civil, 32 LPRA Ap. V. R. 43.2 establece en lo pertinente que "[l]as determinaciones de hecho basadas en el testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos."

En nuestro ordenamiento jurídico, la "tarea de adjudicar credibilidad y determinar lo que realmente ocurrió depende en gran medida de la exposición del juez o la jueza a la prueba presentada". *Gómez Márquez et al. v. El Oriental,* 203 DPR 783, 792 (2020). Esto "incluye, entre otros factores, ver el comportamiento del testigo mientras ofrece su testimonio y escuchar su voz". *Íd,* citando a

---

demanda contra tercero instada en contra de Rosa Figueroa Román. Ese mismo día, el foro a quo dictó sentencia declarando *Ha Lugar* el desistimiento.

*Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 771 (2013). Los tribunales apelativos "no celebramos juicios plenarios, no presenciamos el testimonio oral de los testigos, no dirimimos credibilidad y no hacemos determinaciones de hechos". *Dávila Nieves v. Meléndez Marín, supra,* pág. 770.

Por ello, los tribunales apelativos no intervenimos con la apreciación de la prueba, la adjudicación de credibilidad y las determinaciones de hechos que realiza ese foro *Sucn. Rosado v. Acevedo Marrero,* 196 DPR 844, 917 (2016). Sin embargo, esa deferencia descansa en un marco de discreción y razonabilidad. *Citibank NA v. Cordero Badillo,* 200 DPR 724, 735 (2018). La discreción es "una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera". *Medina Nazario v. McNeil Healthcare LLC,* 194 DPR 723, 729 (2016). Así que, ese juicio discrecional "no es en función al antojo o voluntad de uno, sin tasa ni limitación alguna". *Santa Aponte v. Srio. Hacienda,* 105 DPR 750, 770 (1977). Los tribunales revisores podremos sustituir el criterio que utilizó el foro primario por el nuestro únicamente cuando existen circunstancias extraordinarias en las que se pruebe que el foro primario actuó con pasión, prejuicio o parcialidad, incurrió en craso abuso de discreción o en un error manifiesto o de derecho. *Citibank NA v. Cordero Badillo, supra,* pág. 736.

Se dice que el tribunal incurrió en un error manifiesto "cuando, de un análisis de la totalidad de la evidencia, el tribunal apelativo queda convencido de que se cometió un error, aunque haya evidencia que sostenga las conclusiones de hecho del tribunal". *Gómez Márquez et al. v. El Oriental,* supra, pág. 793. Esto implica que "la apreciación de esa prueba se distancia de la realidad fáctica o es inherentemente imposible o increíble". *Íd.* Véase, también, *Pueblo v. Rivera Montalvo,* 205 DPR 352, 374 (2020). Dicho

estándar de revisión, "restringe nuestra facultad para sustituir el criterio del foro primario a escenarios en los que de la prueba admitida *no exista base suficiente que apoye tal determinación".* *Pueblo v. Toro Martínez,* 200 DPR 834, 859 (2018). (Énfasis en original).

Por otro lado, el juzgador incurre en pasión, prejuicio o parcialidad si actúa "movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna". *Dávila Nieves v. Meléndez Marín, supra,* pág. 782. De otra parte, un tribunal puede incurrir en abuso de discreción cuando el juez: (1) ignora sin fundamento algún hecho material importante que no podía pasar por alto, (2) concede demasiado peso a un hecho inmaterial y funda su decisión principalmente en ese hecho irrelevante, (3) a pesar de examinar todos los hechos del caso, hace un análisis liviano y la determinación resulta irrazonable. *Pueblo v. Sanders Cordero,* 199 DPR 827, 841 (2018).

Cónsono con lo anterior, la Regla 19 (A) del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 19, dispone lo siguiente:

> Cuando la parte apelante haya señalado algún error relacionado con la suficiencia de la prueba testifical o con la apreciación errónea de ésta por parte del tribunal apelado, **someterá una transcripción**, una exposición estipulada o una exposición narrativa de la prueba. (Énfasis nuestro).

A tenor con lo dispuesto en la aludida regla, aquella parte que señale un error referente a la suficiencia de la prueba o la apreciación errónea de esta es quien tiene la responsabilidad de someter al foro revisor una transcripción, una exposición estipulada o una exposición narrativa de la prueba. El foro intermedio apelativo no puede cumplir a cabalidad su función revisora sin que

se le produzca, mediante alguno de los mecanismos provistos para ello, la prueba que tuvo ante sí el foro primario.

### B. Daños Contractuales

Conforme a nuestro ordenamiento jurídico, "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado". 31 LPRA ant. sec. 5141.[6] Por consiguiente, una acción de daños requiere que concurran tres requisitos: "(1) tiene que haber un daño real; (2) debe existir nexo causal entre el daño y la acción u omisión de otra persona, y (3) el acto u omisión tiene que ser culposo o negligente". *López v. Porrata Doria*, 169 DPR 135, 150 (2006) (Cita omitida). Establecido esto, "[l]a imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización". 31 LPRA ant. sec. 5141. Ante ello, las reclamaciones por responsabilidad civil extracontractual "se distinguen porque la responsabilidad frente al perjudicado surge sin que le preceda una relación jurídica entre las partes". *Maderas Tratadas v. Sun Alliance*, 185 DPR 880, 908 (2012).

Ahora bien, para que proceda una acción en daños contractuales, el daño tiene que ser producto de una previa relación jurídica entre las partes contratantes. *Íd.,* pág. 910; 31 LPRA ant. sec. 3018. Asimismo, cuando la indemnización de daños surge de un incumplimiento contractual, nuestro ordenamiento dispone que los daños y perjuicios que produzca una parte que incumple de buena fe son indemnizables si fueran previsibles al momento de otorgarse la obligación y, además, son consecuencia necesaria del incumplimiento. 31 LPRA ant. sec. 3024. Sin embargo, en caso de un incumplimiento doloso, la parte responde por todos los daños

---

[6] Cabe destacar que las acciones del presente caso fueron instadas previo a la vigencia del nuevo *Código Civil de Puerto Rico*, Ley Núm.55-2020 ("*Código Civil de 2020*"), el cual entró en vigor el 28 de noviembre de 2020.

que se deriven de su incumplimiento. *Íd.* Al igual que en una acción de daños extracontractuales, la parte tiene el deber de evidenciar el daño y el nexo causal.

A los efectos de establecer nexo causal, en Puerto Rico rige la doctrina de causa adecuada. Conforme a esta doctrina, "no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general". *Nieves Díaz v. González Massas*, 178 DPR 820, 844 (2010) (Cita y escolio omitido). Este es un "elemento imprescindible en una reclamación por daños y perjuicios, es un elemento del acto ilícito que vincula al daño directamente con el hecho antijurídico". *Íd.*, págs. 844-845 (Escolio omitido).

Por último, cabe destacar que para propósitos de la acción por unos mismos hechos, el perjudicado deberá optar por reclamar uno de los dos tipos de daños, debido a que la indemnización dual provocaría una duplicidad de remedios. *Maderas Tratadas v. Sun Alliance*, supra, pág. 911.

### III.

En la controversia que nos ocupa, los Apelantes nos solicitan la revocación de una *Sentencia* dictada por el foro primario el 20 de septiembre de 2024. En su recurso, esbozaron que el foro *a quo* cometió dos (2) errores. En el primero, señalan que el foro *a quo* erró en determinar la procedencia de la deuda reclamada por la Apelada, pese a que no se presentó evidencia suficiente para llegar a dicha conclusión. Por otro lado, en el segundo, apuntan a que el foro primario incidió al no conceder el pago de los certificados de depósito y denegar la reclamación en daños por incumplimiento interpuesta por éstos. Por encontrarse íntimamente relacionado procedemos a atender ambos señalamientos de error de manera conjunta.

En su *Sentencia*, el foro primario adjudicó varias controversias que tenía ante su consideración. Para llegar esta

determinación, formuló cuarenta y tres (43) determinaciones de hechos, las cuales se fundamentaron, en gran medida, por la prueba desfilada en el juicio. Tan es así, que el que foro *a quo* concluye su dictamen con el siguiente párrafo:

> Finalmente, no habiendo asuntos pendientes por adjudicar, este Tribunal dicta sentencia de conformidad con los términos que surgen de la misma. El Tribunal llegó a su conclusión luego de tener la oportunidad de ver a los testigos, observar su manera de declarar, de poder apreciar sus gestos, titubeos, contradicciones, manerismos, dudas, vacilaciones de los testigos, las resoluciones dictadas que se describan en esta determinación y, por consiguiente, de ir formando gradualmente en nuestra conciencia la convicción en cuanto a quién dice la verdad. (Citas omitidas.).[7]

Nótese que, contrario a lo que argumentan los Apelantes, el foro primario tomó en consideración el testimonio de los testigos que declararon en sala para resolver las controversias y no se fundamentó únicamente en documentos tales como la declaración jurada suscrita por el señor Torres Montes. En ese sentido, nos vemos imposibilitados de revisar los fundamentos esbozados por el foro primario en su *Sentencia*, pues, los errores señalados por los Apelantes cuestionan la apreciación de la prueba. Para que podamos determinar si el foro *a quo* actuó con pasión, perjuicio, parcialidad o si incurrió en error manifiesto, **es indispensable que tengamos ante nuestra consideración**, **la totalidad de la prueba desfilada**. No empecé a ello, en este caso, no contamos las herramientas necesarias para evaluar la determinación apelada, la cual está fuertemente sustentada en la apreciación de los testimonios.

Es preciso resaltar que, en nuestro ordenamiento jurídico, es la parte apelante la responsable de probar que existe prueba que contradice la determinación del foro primario. Para ello, cuando en un recurso se señala algún error relacionado con la apreciación de

---

[7] Véase, apéndice del recurso, pág. 29.

la prueba por parte del foro *a quo*, la parte apelante **tiene que presentar una transcripción o una exposición estipulada o una exposición narrativa de la prueba para que de esta manera el Tribunal de Apelaciones pueda cumplir cabalmente con su función revisora**. *Álvarez v. Rivera,* 165 DPR 1, 13 (2005).

Al no tener disponible una transcripción que nos permita evaluar los testimonios vertidos en sala, estamos imposibilitados de evaluar la apreciación de la prueba que ejerció el foro primario. Por consiguiente, no podemos atender en los méritos el primer y segundo señalamiento de error toda vez a que estos están sustentados en cuestionamientos sobre cómo el foro primario apreció la prueba.

**IV.**

Por los fundamentos expuestos, **confirmamos** la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones